UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

NANCY ALTAGRACIA MAISONAVE,                    :

                          Plaintiff,           :      18 Civ. 2960 (HBP)

        -against-                              :      OPINION
                                                      AND ORDER
NANCY A. BERRYHILL,                            :
Acting Commissioner of
Social Security,                               :

                          Defendant.           :

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/3/19

          PITMAN, United States Magistrate Judge:


I.   Introduction

          Plaintiff Nancy Altagracia Maisonave brings this action

pursuant to section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner"),

denying her application for disability insurance benefits ("DIB")

for the period beginning December 13, 2011 and continuing to the

present (Complaint, dated Apr. 4, 2018 (Docket Item ("D.I.") 1)

("Compl.")).  Plaintiff has moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure

(D.I. 14).  All parties have consented to my exercising plenary

jurisdiction pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, plaintiff's motion is denied.

## II. Facts[1]

### A. Procedural Background

On October 4, 2014, plaintiff filed an application for DIB, alleging that she became disabled on December 13, 2011 (Tr. 236). After her application for benefits was initially denied on December 6, 2013 (Tr. 158-63), she requested, and was granted, a hearing before an administrative law judge ("ALJ") (Tr. 165-66, 185-210).

Plaintiff and her attorney appeared before ALJ Seth Grossman for a hearing on July 23, 2015 and May 9, 2016, at which plaintiff, vocational expert ("VE") Dr. Tites,[2] VE David Festa and a medical expert, Dr. Allan Levine, testified (Tr. 30-74, 75-141). On December 13, 2016, the ALJ issued his decision finding that plaintiff was not disabled (Tr. 12-29). This decision

---

[1]I recite only those facts relevant to the resolution of the pending motion. The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) sets out plaintiff's social and medical history more fully (Administrative Record, dated June 13, 2018 (D.I. 13) ("Tr.")).

[2]The hearing transcript from July 23, 2015 refers to the vocational expert as "Dr. Tites" and "Mr. Tites," but does not disclose his first name; Dr. Tites's resumé is not contained in the record.

became the final decision of the Commissioner on March 9, 2018 when the Appeals Council denied plaintiff's request for review (Tr. 1-5). Plaintiff timely commenced this action on April 4, 2018, seeking review of the Commissioner's decision (Compl.).

B.  Social Background

Plaintiff was born on June 9, 1965 and was 49 years old when she applied for DIB (Tr. 236). Plaintiff was married with two adult daughters (Tr. 43), and she lived with her husband in the Bronx (Tr. 236). Plaintiff's "Work History Report" stated that she was employed from 1998 to 2011 as a factory worker who washed linens (Tr. 285-86). She worked eight hours per day, five days per week, and her work included lifting laundry baskets that weighed up to 20 pounds (Tr. 286). Plaintiff's "Disability Report" stated that she could speak and understand English, but that she was unable to read or write in English (Tr. 292); she testified at the hearing through an interpreter (Tr. 33-34, 77-78).

C.  Medical Background

1.  Dr. Virginia Contreras

Plaintiff's primary care physician referred plaintiff
to Dr. Virginia Contreras, a psychiatrist, for depression and
irritability (Tr. 363, 412).  In plaintiff's first appointment
with Dr. Contreras on December 13, 2011, plaintiff reported
feeling angry at times during the previous six months, with the
urge "to hurt someone" (Tr. 363, 412).  Plaintiff also reported
an inability to sleep and decreased libido, but she denied any
suicidal thoughts (Tr. 363, 412).  In her examination of plain-
tiff's mental status, Dr. Contreras noted that plaintiff was
alert and oriented, with coherent speech and a depressed, tearful
mood (Tr. 363, 412).

On February 1, 2012, plaintiff reported that she
continued to feel irritable (Tr. 364, 413), but at her March 3,
2012 appointment, she told Dr. Contreras that she was sleeping
better (Tr. 365, 415).  In May of 2012, plaintiff reported
feeling very angry at her daughter after her daughter was caught
stealing and got into a fight with another girl (Tr. 365, 415).
At plaintiff's September 13, 2012 appointment, Dr. Contreras
noted that plaintiff was depressed as a result of the deaths of
her brother and sister and that plaintiff was no longer working

4

because the laundry business where she had been employed had burned down (Tr. 366, 414).

On November 15, 2012, Dr. Contreras noted that plaintiff was stable and that she denied any suicidal or homicidal thoughts (Tr. 416). In February of 2013, plaintiff reported that she had gone to the psychiatric emergency room twice "due to angry episodes"; she was discharged after a few hours (Tr. 367, 424). Plaintiff again denied any suicidal or homicidal thoughts (Tr. 367, 424).

In August of 2013, Dr. Contreras diagnosed plaintiff with depression (Tr. 368, 423). Plaintiff's PHQ-9[3] score was 27 on August 8, 2013 (Tr. 437). Dr. Contreras noted that plaintiff's husband, who attended plaintiff's appointment with her, felt that plaintiff was depressed, and that plaintiff was "very concerned" that her husband might lose his job (Tr. 368, 423). Plaintiff was also continuing to grieve the deaths of her sib-

---

[3]The PHQ-9 is a questionnaire used to assess the severity of a patient's depression. A score of 20 to 27 indicates severe depression; a score of 15 to 19 indicates moderately severe depression; a score of 10 to 14 indicates moderate depression; and a score of 5 to 9 indicates mild depression. See PHQ-9 Questionnaire for Depression Scoring and Interpretation, University of Michigan, http://www.med.umich.edu/1info/-FHP/practiceguides/depress/score.pdf (last visited Aug. 12, 2019).

lings and "having issues" with her 18-year-old daughter (Tr. 368, 423).

On August 8, 2013, Dr. Contreras wrote that plaintiff sufferered from "frequent decompensations and psychiatric hospitalizations which require highly dosed treatment with psychotropic medications" (Tr. 328). Dr. Contreras opined that as a result of her psychiatric condition and the sedative effects of her medication, plaintiff was unable to work (Tr. 328).

At plaintiff's November 8, 2013 appointment, Dr. Contreras noted that plaintiff was stable and denied any suicidal or homicidal thoughts (Tr. 369, 422). However, plaintiff's PHQ-9 score remained at 27 (Tr. 438), and she reported that her husband had lost his job and that they were four months behind on their rent payments (Tr. 369, 422).

In a medical source statement dated January 29, 2014 (Tr. 397-99), Dr. Contreras opined that plaintiff's abilities to understand, remember and carry out simple and complex instructions and to make judgments on simple and complex work-related decisions were markedly limited (Tr. 397). Dr. Contreras also found that plaintiff's abilities to interact appropriately with the public, supervisors and co-workers and to respond appropriately to usual work situations and changes in a routine work setting were markedly limited (Tr. 398). Dr. Contreras wrote

that she based her findings on clinical assessments, laboratory testing and plaintiff's PHQ-9 scores (Tr. 398). Finally, she opined that plaintiff's limitations first presented on December 13, 2011 (Tr. 398).

Throughout the rest of 2014 and into 2015, plaintiff remained stable according to Dr. Contreras (Tr. 417-21). Although plaintiff's mood was depressed in March of 2014, it improved to "pleasant" by August (Tr. 420-21), but her August 6, 2014 PHQ-9 score was 26 (Tr. 435). However, on October 27, 2014, plaintiff's PHQ-9 score had improved to 17 (Tr. 434). In December of 2014 and April of 2015, plaintiff reported that her sleep and appetite were adequate (Tr. 417-18). On April 17, 2015, Dr. Contreras wrote a letter identical to her August 8, 2013 letter on plaintiff's behalf (Tr. 410). Dr. Contreras reiterated her opinion that plaintiff was unable to work (Tr. 410). On June 29, 2015, plaintiff's PHQ-9 score had gone up to 22 (Tr. 432).

In a mental impairment questionnaire dated June 29, 2015, Dr. Contreras wrote that plaintiff "presents with severe depression that has been recurring and remitting for the past several years. [Plaintiff] also presents with uncontrollable anger." (Tr. 426). Dr. Contreras listed plaintiff's signs and

symptoms as anhedonia,[4] appetite disturbance with weight change, decreased energy, thoughts of suicide, hallucinations or delusions, inappropriate affect, feelings of guilt or worthlessness, motor tension, impulse control impairment, emotional lability, generalized persistent anxiety, neck and body pain and headache, mood disturbance, difficulty thinking or concentrating, paranoid thinking, sleep disturbance and emotional withdrawal (Tr. 427, 429). She opined that plaintiff was "[u]nable to meet competitive standards" with respect to her abilities to remember work-like procedures, to maintain attention for two hours, to maintain regular attendance and be punctual, to sustain an ordinary routine, to work with or near others without undue distraction, to make simple work-related decisions, to complete a normal workday and workweek without interruption, to perform at a consistent pace, to accept instruction and respond appropriately to criticism, to respond appropriately to changes in a routine work setting, to deal with normal work stress, to interact appropriately with the general public, to maintain socially appropriate behavior, to adhere to basic standards of neatness

---

[4]Anhedonia means "total loss of feeling of pleasure in acts that normally give pleasure." Dorland's Illustrated Medical Dictionary, at 91 (32nd ed. 2012) ("Dorland's").

and cleanliness, to travel in unfamiliar places and to use public transportation (Tr. 428).

### 2. Dr. Marilee Mescon

Dr. Marilee Mescon, a consulting internist, examined plaintiff on November 14, 2013 (Tr. 384-87). Plaintiff complained of an accidental puncture wound to her right hand, which she sustained when she fell on a key (Tr. 384). Plaintiff reported undergoing two hand surgeries after her fall (Tr. 384). Plaintiff denied any history of high blood pressure, diabetes, heart problems, asthma, emphysema or seizures (Tr. 384).

Plaintiff reported to Dr. Mescon that she started smoking cigarettes in 2010 and that she smoked one pack per day (Tr. 384). She denied drinking alcohol or using illegal drugs (Tr. 384). Plaintiff reported that she cooked, cleaned, did laundry and shopped (Tr. 384). She showered, bathed and dressed herself and spent her time watching television (Tr. 384).

Upon examination, plaintiff appeared to be in no acute distress (Tr. 385). She was able to sit, stand and walk normally and without assistance, and she did not require help changing her clothes or getting on and off the exam table (Tr. 385). Plaintiff was wearing a splint on her right wrist (Tr. 385). She reported a loss of sensation in her right thumb and right index

9

finger and a tingling sensation in the third finger of her right hand (Tr. 386). Dr. Mescon assessed plaintiff's motor strength in her right hand at a 2 out of 5 and in her left hand at a 5 out of 5 (Tr. 386).

Dr. Mescon diagnosed plaintiff with penetrating trauma to her right hand (Tr. 386). Dr. Mescon wrote in her medical source statement that plaintiff had no limitations on her ability to sit, stand, climb, push, pull or carry heavy objects, but that her ability to pinch or "to pick up a coin from a flat surface would be severely limited because of loss of feeling in the right thumb and right index finger" (Tr. 386).

### 3. Dr. W. Amory Carr

Dr. W. Amory Carr, a consulting psychologist, evaluated plaintiff on November 14, 2013 (Tr. 389-93). Plaintiff reported to Dr. Carr that she had been taken to the psychiatric emergency room at North Central Bronx Hospital twice in 2013 because she did not "feel like herself" (Tr. 389). At the time of the evaluation, she was seeing Dr. Contreras and a therapist once per month and taking Zoloft, Seroquel, vitamin D, Viibryd, co-trimoxazole, gabapentin and Ambien[5] (Tr. 389-90).

---

[5]Zoloft is the brand name for sertraline, which is "used to
(continued...)

Plaintiff reported that she had difficulty falling

---

    [5](...continued)
treat depression, obsessive-compulsive disorder . . ., panic
attacks . . ., posttraumatic stress disorder . . ., and social
anxiety disoder." Sertraline, MedlinePlus,
https://medlineplus.gov/druginfo/meds/a697048.html (last visited
Aug. 6, 2019).

    Seroquel is the brand name for quetiapine, which is "used
alone or with other medications to treat episodes of mania
(frenzied, abnormally excited or irritated mood) or depression in
patients with bipolar disorder (manic depressive disorder; a
disease that causes episodes of depression, episodes of mania,
and other abnormal moods)." Quetiapine, MedlinePlus, https://
medlineplus.gov/druginfo/meds/a698019.html (last visited May 16,
2019).

    Vitamin D is "a nutrient . . . that is needed for health and
to maintain strong bones." Vitamin D, National Institutes of
Health Office of Dietary Supplements, https://ods.od.nih.gov/
factsheets/VitaminD-Consumer/ (last visited Aug. 6, 2019).

    Viibryd is the brand name for vilazodone, which is "used to
tread depression." Vilazodone, MedlinePlus, https://
medlineplus.gov/druginfo/meds/a611020.html (last visited Aug. 6.
2019).

    Co-trimoxazole is "used to treat certain bacterial
infections, such as pneumonia . . ., bronchitis . . ., and
infections of the urinary tract, ears, and intestines." Co-
trimoxazole, MedlinePlus, https://medlineplus.gov/druginfo/meds/
a684026.html (last visited Aug. 6, 2019).

    Gabapentin is "used to help control certain types of
seizures in people who have epilepsy," "to relieve the pain of
postherpetic neuralgia," "to relieve the pain of diabetic
neuropathy" and "to treat and prevent hot flashes . . . ."
Gabapentin, MedlinePlus, https://medlineplus.gov/druginfo/meds/
a694007.html (last visited Aug. 6, 2019).

    Ambien is a brand name for zolpidem, which is "used to treat
insomnia." Zolpidem, MedlinePlus, https://medlineplus.gov/
druginfo/meds/a693025.html (last visited Aug. 6, 2019).

asleep and that she had an increased appetite which resulted in weight gain (Tr. 390). Plaintiff also reported experiencing symptoms of depression and anxiety, including crying spells, irritability, difficulty concentrating, social withdrawal, excessive worry, nightmares, restlessness and muscle tension (Tr. 390). She denied any symptoms of mania or thought disorder, but she reported poor short-term memory and "receptive language deficits" (Tr. 390).

In an evaluation of plaintiff's mental status, Dr. Carr noted that plaintiff was cooperative but that her manner of relating was somewhat childish (Tr. 390). She was casually dressed and well groomed, with normal posture and appropriate eye contact but somewhat restless motor behavior (Tr. 390). Plaintiff's speech was fluent and clear, but Dr. Carr was unable to assess her expressive and receptive language due to a language barrier (Tr. 390). Plaintiff's thought processes were coherent and goal-directed, with no evidence of hallucinations, delusions or paranoia (Tr. 391). Plaintiff had a full range of affect with one occasion of inappropriate laughter (Tr. 391). Her attention and concentration were impaired; she was unable to count to 20 or to perform simple calculations or serial subtractions (Tr. 391). Her recent and remote memory skills were also impaired; she could recall only two out of three objects after a five-minute period

and could not recite four digits forward or three digits backward (Tr. 391). Finally, Dr. Carr found that plaintiff's intellectual functioning was below average, her fund of information was appropriate and her insight and judgment were fair (Tr. 391).

Dr. Carr noted that plaintiff was able to dress, bathe and groom herself, but she had sometimes gone two or three days without showering and feared drowning in the bath (Tr. 391). She did not cook because she forgot to turn the stove off, and she did not clean because she forgot to do so or put it off (Tr. 391). She did not shop because she did not like to go outside, and she did not manage money because she was "too forgetful" (Tr. 391). She did do some laundry (Tr. 391). Her social life was limited to her immediate family (Tr. 391-92).

In a medical source statement, Dr. Carr wrote that plaintiff's ability to understand and follow simple directions and instructions was mildly limited (Tr. 392). Her abilities to maintain attention and concentration, learn new tasks, make appropriate decisions, relate adequately with others and appropriately deal with stress were moderately limited (Tr. 392). Her abilities to perform simple tasks independently and to maintain a regular schedule were moderately-to-markedly limited (Tr. 392). Plaintiff's ability to perform complex tasks independently was markedly limited (Tr. 392). Dr. Carr attributed plaintiff's

13

limitations to her anxiety and depression and wrote that, "[t]he results of the evaluation are consistent with psychiatric problems and may significantly interfere with the claimant's ability to function on a daily basis" (Tr. 392). Dr. Carr diagnosed plaintiff with unspecified depressive disorder and unspecified anxiety disorder (Tr. 392). Dr. Carr also ruled out a diagnosis of borderline intellectual functioning (Tr. 392). Dr. Carr recommended that plaintiff continue with mental health treatment (Tr. 392).

### 4. Dr. Ruby Phillips

Dr. Ruby Phillips, a consulting psychologist, evaluated plaintiff on June 4, 2016 (Tr. 453-56). Plaintiff reported to Dr. Phillips that she had been hospitalized for depression in October 2015 and for high blood pressure in 2016 (Tr. 453). At the time of the evaluation, plaintiff reported that she had been seeing a psychiatrist once per month since 2011 and a psychologist once per week since 2011 and taking omeprazole, ibuprofen, Zoloft, Seroquel, metformin, Ambien, ferrous sulfate, penicillin and verapamil[6] (Tr. 453).

---

[6]Omeprazole is "used alone or with other medications to treat the symptoms of gastroesophageal reflux disease (GERD) . . . ." Omeprazole, MedlinePlus, https://medlineplus.gov/druginfo/
(continued...)

Plaintiff reported that she had difficulty falling asleep but that her appetite was normal (Tr. 453). Plaintiff also reported experiencing symptoms of depression and anxiety, including crying spells, difficulty concentrating, excessive worry and restlessness (Tr. 453). She denied any symptoms of mania, but she reported poor short-term memory and auditory hallucinations, including hearing voices and knocks at the door (Tr. 453-54).

In an evaluation of plaintiff's mental status, Dr. Phillips noted that plaintiff was cooperative but that her manner of relating was somewhat immature (Tr. 454). She was appropriately dressed and adequately groomed, with normal posture and motor behavior and appropriate eye contact (Tr. 454). Plain-

---

[6](...continued)
meds/a693050.html (last visited Aug. 7, 2019).

Metformin is "used alone or with other medications, including insulin, to treat type 2 diabetes . . . ." Metformin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a696005.html (last visited Aug. 7, 2019).

Ferrous sulfate is an iron supplement "used to treat or prevent anemia . . . ." Iron Supplements, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682778.html (last visited Aug. 7, 2019).

Verapamil is "used to treat high blood pressure and to control angina (chest pain)." Verapamil, MedlinePlus, https://medlineplus.gov/druginfo/meds/a684030.html (last visited Aug. 7, 2019).

tiff's speech was fluent and clear, and her expressive and
receptive language skills were adequate (Tr. 454). Plaintiff's
thought processes were coherent and goal-directed, with no
evidence of hallucinations, delusions or paranoia (Tr. 454).
Plaintiff had a full range of affect (Tr. 454). Her attention
and concentration were intact; she was able to count and to
perform simple calculations and serial subtractions (Tr. 455).
Her recent and remote memory skills were impaired; she could
recall only one out of three objects immediately and zero out of
three objects after a five-minute period and could not recite
digits forward or backward (Tr. 455). Finally, Dr. Phillips
found that plaintiff's intellectual functioning was average, her
fund of information was appropriate, her insight was poor and her
judgment was fair (Tr. 455).

    Dr. Phillips noted that plaintiff was able to dress,
bathe and groom herself, but she did not cook because of poor
concentration (Tr. 455). She sometimes cleaned but did not do
laundry or shop (Tr. 455). She managed her own money but did not
take public transportation (Tr. 455). Plaintiff reported good
familial relationships (Tr. 455). She spent her time playing
dominoes, drinking coffee and sitting in front of her building
(Tr. 455).

In her medical source statement, Dr. Phillips wrote
that plaintiff's abilities to learn new tasks, perform complex
tasks independently, make appropriate decisions and deal appro-
priately with stress were markedly limited (Tr. 455). Her
ability to relate adequately with others was moderately limited
(Tr. 455). Plaintiff demonstrated no limitation in her abilities
to understand and follow simple directions and instructions,
perform simple tasks independently, maintain attention and
concentration and maintain a regular schedule (Tr. 455). Dr.
Phillips attributed plaintiff's limitations to her anxiety and
"psychotic symptoms" and wrote that, "[t]he results of the
present evaluation are consistent with psychiatric and cognitive
problems, and these may significantly interfere with the claim-
ant's ability to function on a daily basis" (Tr. 456). Dr.
Phillips diagnosed plaintiff with an unspecified psychotic
disorder and persistent depressive disorder (Tr. 456). She also
ruled out a diagnosis of neurocognitive disorder (Tr. 456). Dr.
Phillips recommended that plaintiff continue with mental health
treatment and undergo a neuropsychological examination (Tr. 456).

In a separate medical source statement also dated June
4, 2016, Dr. Phillips indicated that plaintiff's abilities to
understand, remember and carry out simple instructions and to
interact appropriately with supervisors, co-workers and the

17

public were moderately limited (Tr. 457-58).[7]  She also indicated
that plaintiff's abilities to understand, remember and carry out
complex instructions and to make judgments on complex work-
related decisions were markedly limited (Tr. 457).  Plaintiff
demonstrated no limitation on her ability to respond appropri-
ately to usual work situations and to changes in a routine work
setting (Tr. 458).

### 5.  Dr. Sharon Revan

Dr. Sharon Revan, a consulting internist, examined
plaintiff on June 4, 2016 (Tr. 462-65).  Plaintiff complained of
a history of shoulder pain, right knee pain, hypertension and
diabetes (Tr. 462).  Plaintiff reported suffering from high blood
pressure for ten years and from diabetes for eight years (Tr.
462).

Plaintiff reported that she started smoking cigarettes
at age 21 and that she smoked two packs per day (Tr. 463).  She
denied drinking alcohol or using illegal drugs (Tr. 463).

---

[7]Dr. Phillips's opinion that plaintiff's abilities to
understand, remember and carry out simple instructions were
moderately limited (Tr. 457) directly contradicts her opinion
that plaintiff demonstrated no limitation in her abilities to
understand and follow simple directions and instructions and
perform simple tasks independently (Tr. 455).  However, the
record does not explain this inconsistency.

Plaintiff reported that she showered and dressed herself, but that her husband and daughter cooked, cleaned, did laundry and shopped (Tr. 463).

Upon examination, plaintiff appeared to be in no acute distress (Tr. 463). She was able to sit, stand and walk normally and without assistance, and she did not require help changing her clothes or getting on and off the exam table (Tr. 463). Plaintiff had a full range of motion in both knees, with crepitus[8] when she bent her knees (Tr. 464). Dr. Revan found plaintiff's hand and finger dexterity intact and assessed plaintiff's grip strength at a 5 out of 5 in both hands (Tr. 465).

Dr. Revan diagnosed plaintiff with right shoulder pain, right knee pain, hypertension and diabetes (Tr. 465). Dr. Revan wrote in her medical source statement that plaintiff had no limitations in her speech, vision, hearing, and fine and gross motor activity of her upper extremities (Tr. 465). Plaintiff's abilities to walk, stand and climb stairs were mildly limited due to her right knee pain, and her abilities to sit and lie down were limited due to knee numbness (Tr. 465). Finally, Dr. Revan

---

[8]Crepitus refers to "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints." Dorland's at 429.

found that plaintiff's activities of daily living were mildly-to-moderately limited as a result of her depression (Tr. 465).

In a separate medical source statement also dated June 4, 2016, Dr. Revan opined that plaintiff could lift and carry items weighing up to 20 pounds one-third of the time, but that she would be unable to lift and carry an item weighing more than 20 pounds (Tr. 466). Dr. Revan found that plaintiff could sit or stand for 30 minutes without interruption and could walk for 10 minutes without interruption (Tr. 467). Out of an eight-hour work day, Dr. Revan opined that plaintiff could sit for two hours, stand for two hours and walk for one hour (Tr. 467).[9] Dr. Revan found that plaintiff had full, continuous use of both hands and both feet and that she was fully able to balance, stoop and crouch, but that she could not kneel, crawl or climb ladders or scaffolds (Tr. 468-69).

---

[9]In response to the question, "If the total time for sitting, standing and walking does not equal or exceed 8 hours, what activity is the individual performing for the rest of the eight hours?" Dr. Revan wrote, "Tired and [right] knee pain" (Tr. 467).

D.  Proceedings Before the ALJ

   1.  Plaintiff's Testimony

        Plaintiff testified that she was fifty years old, that
she was born in Santo Domingo, Dominican Republic, and that she
had lived in the United States for more than 18 years (Tr. 35,
78-79).  She completed only a year or two of school in the
Dominican Republic (Tr. 35-36).  Plaintiff worked for 13 or 14
years at a laundry, operating a machine that sorted towels (Tr.
36, 50, 79, 82-83).  She also testified that she was unable to
work due to the damage to a tendon in her hand that resulted from
her falling on her keys (Tr. 60-61, 79-80).  Plaintiff testified
that her right hand and elbow felt numb and that she experienced
cramping from her fingers up to her elbow (Tr. 85-86, 101-02).
The cramping and loss of sensation was worst in her thumb and
index finger (Tr. 104).  She had had several previous surgeries
on her hand and was scheduled for another surgery on her hand and
elbow a few months after the July 23, 2015 hearing (Tr. 61-62,
80).  However, plaintiff testified that she had no difficulty
standing or walking (Tr. 64).

        With respect to her mental impairments, plaintiff
testified that she was also unable to work because of her inabil-
ity to concentrate, that her "mind just starts [wandering] off"

                              21

(Tr. 43, 79). She received treatment from Dr. Contreras frequently (Tr. 86-87). She was uncomfortable around other people and did not like having people "in back of" her (Tr. 84). Plaintiff testified that she did not cook, clean or do laundry, that she did not "have the desire" to bathe and that her 27-year-old daughter did "everything" for her (Tr. 98-100).

2. Vocational Expert Testimony

VE Dr. Tites ("VE Tites") testified at the July 23, 2015 hearing (Tr. 67-74). VE Tites characterized plaintiff's past work as a laundry worker, which is defined in the United States Department of Labor's Dictionary of Occupational Titles ("DOT") as either medium- or light-exertion, depending on the industry in which the laundry worker worked (Tr. 70). The ALJ asked VE Tites whether a hypothetical person of plaintiff's education and experience, with "no limitations in climbing, pushing, pulling or carrying heavy objects" but who could not "pick up a coin from a flat surface" could perform plaintiff's past work (Tr. 70-71). VE Tites testified that such an individual could perform plaintiff's past work (Tr. 71). The ALJ then asked VE Tites whether a hypothetical person of plaintiff's education and experience who could lift and carry up to 20 pounds with "no limitations on sitting or standing," but who was limited

to carrying out simple instructions and who could not pick up a coin from a flat surface or "perform a similar type operation" could perform plaintiff's past work (Tr. 71). VE Tites testified that such an individual could also perform plaintiff's past work (Tr. 71). VE Tites also confirmed that plaintiff's past work required only occasional contact with supervisors and co-workers and no contact with the public, and that an individual doing such work could be off-task up to ten percent of the time and absent once per month (Tr. 71-72).

When asked by plaintiff's counsel if the hypothetical individual described by the ALJ could perform plaintiff's past work if she was off-task 20 percent of the time, VE Tites testified that she could not (Tr. 72-73).

VE David Festa ("VE Festa") testified at the May 9, 2016 hearing (Tr. 118-26, 131-40). VE Festa characterized plaintiff's past work as a laundry laborer, which is defined in the DOT as medium-exertion, unskilled work (Tr. 123). VE Festa characterized plaintiff's performance of her past work as light-exertion because she was required to lift and carry a maximum of 20 pounds (Tr. 123). The ALJ asked VE Festa if a hypothetical individual who could perform the full range of light-exertion work with the limitation that she "avoid forceful torque," such as using a screwdriver, could perform plaintiff's past work (Tr.

124). VE Festa testified that such an individual could perform plaintiff's past work as she actually performed it (Tr. 124). When asked by the ALJ if the same hypothetical individual could perform plaintiff's past work if she could lift up to 20 pounds with either her left hand or both hands, VE Festa testified that such an individual could also perform plaintiff's past work (Tr. 125). When asked by the ALJ if a hypothetical individual of plaintiff's education and experience who could perform a full range of light-exertion work except for tasks involving "forceful torque" and who was limited to simple tasks with only occasional contact with supervisors, co-workers and the public could perform plaintiff's past work, VE Festa testified that such an individual could perform plaintiff's past work (Tr. 126).

In response to testimony by plaintiff that her past work involved pushing wheeled carts of towels weight approximately 100 pounds, VE Festa testified that the work of a laundry laborer who had to push such carts would be considered medium-exertion or heavy-exertion (Tr. 132).

Finally, when asked by the ALJ if there were any jobs that a hypothetical individual of plaintiff's education and experience who could do medium-exertion work of lifting and carrying up to 30 pounds, except for tasks involving "forceful torque," and who was limited to simple tasks with only occasional

24

contact with supervisors, co-workers and the public could perform, VE Festa testified that such an individual could work as a hand packager, DOT code number 920.587-018, with 53,252 jobs nationally (Tr. 133-35).

### 3. Medical Expert Testimony

Dr. Allan Levine, a medical expert in orthopedic surgery, testified at the May 9, 2016 hearing (Tr. 93-117). He testified that an x-ray of plaintiff's right hand on May 24, 2013 revealed mild radial displacement or partial dislocation of the first metacarpal (Tr. 106). Plaintiff was diagnosed with right carpal tunnel syndrome and trigger finger[10] of the right ring finger on July 9, 2013 (Tr. 107). She underwent surgery on September 18, 2013, and an examination of her hand on November 11, 2013 disclosed a "fairly normal range of motion" (Tr. 108). Dr. Levine noted that plaintiff had a second operation on her hand on May 5, 2014 and that by July of 2014 she "was doing well" (Tr. 109).

Dr. Levine opined that plaintiff's physical impairments did not meet or equal one of the listed impairments in 20 C.F.R.,

---

[10]Trigger finger refers to "a finger liable to have a momentary spasmodic arrest of flexion or extension followed by a snapping into place, due either to stenosing tenosynovitis or to a nodule in the flexor tendon." Dorland's at 708.

Part 404, Subpart P, Appendix 1 because he "found no evidence of extreme loss of fine and gross manipulation of both upper extremities"; he explained that plaintiff's impairment only affected her right hand (Tr. 109). He also noted plaintiff's statements in the record that she was able to cook, clean, do laundry, shop, dress, bathe, shower, watch television and smoke cigarettes (Tr. 109).

With respect to plaintiff's RFC, Dr. Levine opined that plaintiff was capable of lifting and carrying 30-pound objects occasionally and 10-pound objects frequently (Tr. 111). She was able to sit, stand and walk for six hours out of an eight-hour work day, with no limitations on her abilities to kneel, crouch, stoop or climb stairs (Tr. 111, 113). Dr. Levine found that plaintiff should avoid ladders, scaffolds and repetitive forceful gripping or twisting activities with her hand (Tr. 113-15).

III.  Analysis

    A.  Applicable Legal
        Principles

        1.  Standard of Review

    The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence

26

or if it is based upon an erroneous legal standard.  42 U.S.C. §
405(g); Lockwood v. Comm'r of Soc. Sec. Admin., 914 F.3d 87, 91
(2d Cir. 2019); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir.
2014) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d
Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).
Moreover, the court cannot "affirm an administrative action on
grounds different from those considered by the agency."
Lesterhuis v. Colvin, 805 F.3d 83, 86 (2d Cir. 2015), quoting
Burgess v. Astrue, supra, 537 F.3d at 128.

        The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence.  Byam v. Barnhart, 336 F.3d 172, 179 (2d
Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir.
1999).  "Even if the Commissioner's decision is supported by
substantial evidence, legal error alone can be enough to overturn
the ALJ's decision."  Ellington v. Astrue, 641 F. Supp. 2d 322,
328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application
of the correct legal principles to the record could lead to only
one conclusion, there is no need to require agency reconsidera-
tion."  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

        "Substantial evidence is evidence that 'a reasonable
mind might accept as adequate to support a conclusion.'"

Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019), quoting

McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014); accord

Talavera v. Astrue, supra, 697 F.3d at 151 ("'Substantial evi-

dence' is 'more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support

a conclusion.'"), quoting Richardson v. Perales, 402 U.S. 389,

401 (1971).  Consequently, "[e]ven where the administrative

record may also adequately support contrary findings on particu-

lar issues, the ALJ's factual findings 'must be given conclusive

effect' so long as they are supported by substantial evidence."

Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam),

quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

Thus, "[i]n determining whether the agency's findings were

supported by substantial evidence, 'the reviewing court is

required to examine the entire record, including contradictory

evidence and evidence from which conflicting inferences can be

drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417 (citation

omitted).

            2.  Determination
                of Disability

     Under Title II of the Act, a claimant is entitled to

DIB if she can establish an "inability to engage in any substan-

tial gainful activity [("SGA")] by reason of any medically
determinable physical or mental impairment which can be expected
to . . . last for a continuous period of not less than 12
months." 42 U.S.C. § 423(d)(1)(A); see Barnhart v. Walton, 535
U.S. 212, 217-22 (2002) (both impairment and inability to work
must last twelve months); Estrella v. Berryhill, supra, 925 F.3d
at 94. The impairment must be demonstrated by "medically accept-
able clinical and laboratory diagnostic techniques," 42 U.S.C. §
423(d)(3), and it must be

> of such severity that [the claimant] is not only unable
> to do [her] previous work but cannot, considering [her]
> age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which [she] lives, or
> whether a specific job vacancy exists for [her], or
> whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A). In addition, to obtain DIB, the
claimant must have become disabled between the alleged onset date
and the date on which she was last insured. See 42 U.S.C. §§
416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; McKinstry v.
Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order),
citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). In
making the disability determination, the Commissioner must
consider: "'(1) the objective medical facts; (2) diagnoses or
medical opinions based on such facts; (3) subjective evidence of

pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 404.1520(a)(4)(i)-(v); see Estrella v. Berryhill, supra, 925 F.3d at 94; Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in SGA. 20 C.F.R. § 404.1520(a)(4)(i). If she is not, the second step requires a determination of whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. See Henningsen v. Comm'r of Soc. Sec. Admin., 111 F. Supp. 3d 250, 264 (E.D.N.Y. 2015); 20 C.F.R. § 404.1520(c). If she does, the inquiry at the third step is whether any of the claimant's impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

30

If the claimant does not meet any of the listings in
Appendix 1, step four requires an assessment of the claimant's
residual functional capacity ("RFC") and whether the claimant can
still perform her past relevant work given her RFC.  20 C.F.R.
§ 404.1520(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at
24-25.  If she cannot, then the fifth step requires assessment of
whether, given the claimant's RFC, she can make an adjustment to
other work.  20 C.F.R. § 404.1520(a)(4)(v).  If she cannot, she
will be found disabled.  20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined in the applicable regulations as "the
most [the claimant] can still do despite [her] limitations."
20 C.F.R. § 404.1545(a)(1).  To determine RFC, the ALJ
"'identif[ies] the individual's functional limitations or re-
strictions and assess[es] [her] . . . work-related abilities on a
function-by-function basis, including the functions in paragraphs
(b),(c), and (d) of 20 [C.F.R. §] 404.1545 . . . .'"  Cichocki v.
Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting
Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July
2, 1996).  The results of this assessment determine the claim-
ant's ability to perform the exertional demands of sustained work
which may be categorized as sedentary, light, medium, heavy or

very heavy.[11]  20 C.F.R. § 404.1567; see Schaal v. Apfel, 134

F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found

to be limited further by nonexertional factors that restrict the

claimant's ability to work.[12]  See Michaels v. Colvin, 621 F.

App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v.

Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010).

The claimant bears the initial burden of proving

disability with respect to the first four steps.  Once the

claimant has satisfied this burden, the burden shifts to the

Commissioner to prove the final step -- that the claimant's RFC

allows the claimant to perform some work other than her past

work.  Estrella v. Berryhill, supra, 925 F.3d at 94; Selian v.

Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537

F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004),

amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir.

2005).

---

[11]Exertional limitations are those which "affect only [the
claimant's] ability to meet the strength demands of jobs (sit-
ting, standing, walking, lifting, carrying, pushing, and pull-
ing)."  20 C.F.R. § 404.1569a(b).

[12]Nonexertional limitations are those which "affect only
[the claimant's] ability to meet the demands of jobs other than
the strength demands," including difficulty functioning because
of nervousness, anxiety or depression, maintaining attention or
concentration, understanding or remembering detailed instruc-
tions, seeing or hearing, tolerating dust or fumes, or manipula-
tive or postural functions, such as reaching, handling, stooping,
climbing, crawling or crouching.  20 C.F.R. § 404.1569a(c).

When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks and citation omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered."). An ALJ may rely on a vocational expert's testimony in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983); accord Snyder v. Colvin, 667 F. App'x 319, 321 (2d Cir. 2016) (summary order) ("When the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony."); Rivera v. Colvin, 11 Civ. 7469 (LTS)(DF), 2014 WL 3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of

the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

B.  The ALJ's Decision

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 15-24).

As an initial matter, the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2017 (Tr. 17).

At step one, the ALJ found that plaintiff had not engaged in SGA since December 13, 2011 (Tr. 17, citing 20 C.F.R. §§ 404.1571 et seq.).

At step two, the ALJ found that plaintiff suffered from the following severe impairments:  "carpal tunnel syndrome and trigger finger in the right hand, anxiety and depression" (Tr. 17, citing 20 C.F.R. §§ 404.1520(c)).

At step three, the ALJ found that plaintiff's impairments, considered individually or in combination, did not meet or medically equal the criteria of one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Tr. 17, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  With respect to

34

plaintiff's physical impairments, the ALJ found that they did not meet or medically equal listing 1.02, 20 C.F.R., Part 404, Subpart P, Appendix 1, because they "only impacted her right hand and apparently have not had an impact on any other major joint" (Tr. 17-18).

The ALJ also found that plaintiff's mental impairments did not meet or medically equal listings 12.04 or 12.06, 20 C.F.R., Part 404, Subpart P, Appendix 1. In reaching his conclusion, the ALJ stated that he considered whether the paragraph B criteria were satisfied and concluded that, because plaintiff's mental impairments did not cause at least one extreme or two marked limitations, the paragraph B criteria were not satisfied (Tr. 18). The ALJ found that plaintiff experienced moderate restriction in activities of daily living, moderate difficulties in social functioning and marked difficulties in maintaining concentration, persistence or pace, with no episodes of decompensation lasting longer than a day (Tr. 18). The ALJ also stated that he considered whether the paragraph C criteria were satisfied, but he found no evidence that plaintiff required a highly supportive living arrangement or that a minimal increase in mental demands or a change in her environment would cause her to decompensate (Tr. 18). Accordingly, the ALJ concluded that plaintiff did not meet the paragraph C criteria (Tr. 18).

35

The ALJ then determined that plaintiff retained the RFC

to perform medium work as defined in 20 C.F.R. § 404.1567(c) with

the limitations that she only occasionally be required to lift or

carry more than 30 pounds and that she not be required to perform

tasks with her right hand that require "forceful torque, such as

tightening screws" (Tr. 19).  He also limited plaintiff to

"simple, unskilled work that does not require significant work

with others" (Tr. 19).  To reach his RFC determination, the ALJ

examined the opinions of the treating and consulting physicians

and determined the weight to be given to each opinion based on

the objective medical record, including the treatment notes of

plaintiff's treating physicians (Tr. 19-22).

The ALJ afforded little weight to the opinions of Dr.

Contreras, plaintiff's treating psychiatrist (Tr. 20-21).  The

ALJ concluded that Dr. Contreras's own treatment notes and the

evaluation by Dr. Phillips, the second consultative psychologist,

did not support Dr. Contreras's opinions dated January 29, 2014

and June 29, 2015 (Tr. 20-21).  Specifically, the ALJ found that

the examinations of plaintiff's mental status from March 27, 2014

through April 17, 2015 were "virtually completely normal," in

contrast to Dr. Contreras's opinions that plaintiff's psychologi-

cal functioning was "markedly limited in every category" and that

plaintiff met the requirements of listings 12.04 and 12.06, 20

C.F.R., Part 404, Subpart P, Appendix 1 (Tr. 20-21). With respect to Dr. Contreras's April 17, 2015 opinion, the ALJ found that plaintiff's statement that her medication did not result in any side effects contradicted Dr. Contreras's assertion that the sedative effects of plaintiff's medication caused her to become completely disabled and that the ultimate issue of disability is reserved to the Social Security Administration (Tr. 19-20).

The ALJ afforded limited weight to the opinion of Dr. Carr because "the weight of the evidence . . . indicates the claimant can do a simple task/instruction job" (Tr. 21). The ALJ did not assign a specific weight to the opinion of Dr. Phillips.

The ALJ afforded "good weight" to the opinion of Dr. Levine, the orthopedic medical expert who reviewed the medical evidence in the record and testified at the hearing (Tr. 21). The ALJ concluded that Dr. Levine's opinion that plaintiff could perform medium-exertion work with the limitations that she not be required to grasp or twist objects with her right hand or to lift or carry more than 30 pounds occasionally or 10 pounds frequently was "supported by the weight of the record evidence" (Tr. 21). The ALJ also afforded "good weight" to Dr. Mescon's opinion that plaintiff had no limitations in her abilities to push or pull objects with her hands (Tr. 21).

Finally, the ALJ afforded "limited weight" to Dr. Revan's opinion that plaintiff's knee pain limited her abilities to stand, walk, sit and lift and carry objects because he did not find sufficient evidence that plaintiff's knee pain had lasted or could be expected to last for more than one year (Tr. 22).

At step four, the ALJ found that plaintiff was capable of performing her past relevant work as a factory worker who washed linens (Tr. 22).

At step five,[13] relying on the testimony of the VE, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given her RFC, age, education and work experience (Tr. 23). Concluding that the expert's testimony was consistent with information in the DOT, the ALJ determined plaintiff could perform those occupations and, accordingly, was not disabled (Tr. 23).

### C. Analysis of the ALJ's Decision

Plaintiff attacks the ALJ's disability determination on two grounds. First, plaintiff claims that in reaching his RFC determination, the ALJ violated the treating physician rule by

---

[13]Although the ALJ found that plaintiff was capable of performing past relevant work at step four, he presented "alternative findings" at step five (Tr. 22-23).

assigning less-than-controlling weight to the opinions of Dr. Contreras, plaintiff's treating psychiatrist. Second, plaintiff claims the ALJ failed to evaluate her testimony properly (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated Oct. 1, 2018 (D.I. 15) ("Pl. Mem.") at 8-17). The Commissioner contends that the ALJ's decision was supported by substantial evidence and should be affirmed (Memorandum of Law in Response to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Motion for Judgment on the Pleadings, dated Nov. 28, 2018 (D.I. 16) ("Def. Mem.") at 15-25).

### 1. ALJ's RFC Finding

#### a. Treating Physician Rule

In considering the evidence in the record, the ALJ must afford deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R.

§ 404.1527(c)(2);[14] see also Shaw v. Chater, 221 F.3d 126, 134

(2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir.

1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford

a treating physician's opinion controlling weight.  20 C.F.R. §

404.1527(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568;

Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3

(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

> [I]f the ALJ decides the [treating physician's] opinion
> is not entitled to controlling weight, it must deter-
> mine how much weight, if any, to give it.  In doing so,
> it must "explicitly consider" the following, nonexclu-
> sive "Burgess factors":  "(1) the frequen[cy], length,
> nature, and extent of treatment; (2) the amount of
> medical evidence supporting the opinion; (3) the con-
> sistency of the opinion with the remaining medical
> evidence; and (4) whether the physician is a special-
> ist."  Selian v. Astrue, 708 F.3d 409, 418 (2d Cir.
> 2013) (per curiam) (citing Burgess, 537 F.3d at 129
> (citing 20 C.F.R. § 404.1527(c)(2))).

Estrella v. Berryhill, supra, 925 F.3d at 95-96.  The Second

Circuit "'do[es] not hesitate to remand when the Commissioner has

not provided "good reasons" for the weight given to a treating

physician[']s opinion.'"  Morgan v. Colvin, 592 F. App'x 49, 50

(2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362

---

[14]The SSA recently adopted regulations that alter the
standards applicable to the review of medical opinion evidence
with respect to claims filed on or after March 27, 2017.  See 20
C.F.R. § 404.1520c.  Because plaintiff's claim was filed before
that date, those regulations do not apply here.

F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015). However, if the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order).

b.  Weight of
    Dr. Contreras's Opinions

The ALJ did provide good reasons for declining to give controlling weight to the opinions of Dr. Contreras, plaintiff's treating psychiatrist, and his reasoning is supported by substantial evidence. As the ALJ correctly noted, Dr. Contreras's assessments of plaintiff's mental condition, as set forth in her own treatment notes, do not support her opinions that plaintiff is incapable of working.[15] Specifically, although Dr. Contreras

_____

[15]Plaintiff argues that "the ALJ did not discount the opinions from Dr. Contreras" on the grounds that Dr. Contreras's treatment notes "'failed to show the extreme limitations set forth in her opinions,'" and, therefore, the court may not affirm the ALJ's decision on this ground (Reply Memorandum in Further Support of Plaintiff's Motion for Judgment on the Pleadings,
(continued...)

opined that plaintiff's medications sedated her to the point of
incapacity to work, neither plaintiff's subjective complaints nor
Dr. Contreras's treatment notes contain any evidence of such
severe side effects. Similarly, in her most recent mental
impairment questionnaire dated June 29, 2015, Dr. Contreras wrote
that plaintiff "presents with uncontrollable anger" (Tr. 426),
but only two treatment notes, one in May of 2012 and the other in
February of 2013, refer to plaintiff experiencing or expressing
feelings of anger. In the same mental impairment questionnaire,
Dr. Contreras opined that plaintiff was "[u]nable to meet compet-
itive standards" with respect to all but a few listed abilities.
However, when asked to explain her findings, she either did not
respond or wrote conclusory statements such as "[Plaintiff's]
degree of mental impairment limit[s] her ability to maintain a
normal work schedule. She suffers with debilitating [sic] and is
incapable of normal day to day activities" (Tr. 428-29). Thus,

_____

[15](...continued)
dated Dec. 19, 2018 (D.I. 17) at 1, quoting Def. Mem. at 19).
However, the ALJ expressly concluded that "the notes and
examinations do not support any greater limitation that [sic] I
find in this decision," "the claimant's treatment notes has [sic]
led me to only afford slight weight to opinion of Dr. Contreras"
and "the treating notes and the most recent consultative
examination do not support [Dr. Contreras's January 29, 2014 and
June 29, 2015 opinions]" (Tr. 20-21). Thus, I am not relying on
a ground that is different from the grounds on which the ALJ
relied.

the ALJ correctly found that Dr. Contreras's opinions are not supported by her own treatment notes.

Furthermore, Dr. Contreras's opinions are contradicted by the results of the consultative evaluations of Dr. Carr and Dr. Phillips. In her January 29, 2014 medical source statement, Dr. Contreras found plaintiff to be markedly limited with respect to all work-related mental activities (Tr. 397-98). However, in November of 2013, less than three months earlier, Dr. Carr opined that plaintiff was markedly limited only in her ability to perform complex tasks independently and her abilities to perform simple tasks independently and to maintain a regular schedule were moderately-to-markedly limited (Tr. 392); in all other respects, Dr. Carr found that plaintiff's limitations ranged between mild and moderate (Tr. 392). Similarly, as explained above, Dr. Contreras found that plaintiff was "[u]nable to meet competitive standards" in most respects in June of 2015 (Tr. 428). However, in June of 2016 Dr. Phillips opined that plaintiff's abilities to learn new tasks, perform complex tasks independently, make appropriate decisions and deal appropriately with stress were markedly limited, but that plaintiff demonstrated no limitation in her abilities to understand and follow simple directions and instructions, perform simple tasks inde-

pendently, maintain attention and concentration and maintain a
regular schedule (Tr. 455).

Finally, although plaintiff claims -- and the ALJ
accepted -- that she did not engage in SGA after December 13,
2011, it appears from the record that plaintiff continued to
perform her past work for some part of 2012. Plaintiff's earn-
ings records indicate earnings of $9,405.30 for 2012, as compared
to $11,355.70 in 2011 and $15,082.60 in 2010 (Tr. 245-46, 259-
60). Dr. Contreras's treatment note from September 13, 2012
indicates that plaintiff "is not working anymore" (Tr. 366, 414
(emphasis added)), which suggests that plaintiff had been working
for some period of time following her initial appointment with
Dr. Contreras on December 13, 2011. The fact that plaintiff
continued to work after her alleged disability onset date under-
mines Dr. Contreras's opinions of plaintiff's incapacity. Thus,
there is substantial evidence in the record to support the ALJ's
assignment of less-than-controlling weight to the opinions of Dr.
Contreras.

2. Plaintiff's Testimony

The Second Circuit set out the framework an ALJ must
follow in assessing the credibility of a plaintiff's subjective
complaints when making an RFC finding:

44

When determining a claimant's RFC, the ALJ is required
to take the claimant's reports of pain and other limi-
tations into account, 20 C.F.R. § 416.929; see
McLaughlin v. Sec'y of Health, Educ. & Welfare, 612
F.2d 701, 704-05 (2d Cir. 1980), but is not required to
accept the claimant's subjective complaints without
question; he may exercise discretion in weighing the
credibility of the claimant's testimony in light of the
other evidence in the record. Marcus v. Califano, 615
F.2d 23, 27 (2d Cir. 1979).

    The regulations provide a two-step process for
evaluating a claimant's assertions of pain and other
limitations. At the first step, the ALJ must decide
whether the claimant suffers from a medically determi-
nable impairment that could reasonably be expected to
produce the symptoms alleged. 20 C.F.R. § 404.1529(b).
That requirement stems from the fact that subjective
assertions of pain alone cannot ground a finding of
disability. 20 C.F.R. § 404.1529(a). If the claimant
does suffer from such an impairment, at the second
step, the ALJ must consider "the extent to which [the
claimant's] symptoms can reasonably be accepted as
consistent with the objective medical evidence and
other evidence" of record. Id. The ALJ must consider
"[s]tatements [the claimant] or others make about [her]
impairment(s), [her] restrictions, [her] daily activi-
ties, [her] efforts to work, or any other relevant
statements [she] make[s] to medical sources during the
course of examination or treatment, or to [the agency]
during interviews, on applications, in letters, and in
testimony in [its] administrative proceedings." 20
C.F.R. § 404.1512(b)(3); see also 20 C.F.R. §
404.1529(a); S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49. An ALJ's credibility

determination is entitled to deference. See Snell v. Apfel, 177

F.3d 128, 135 (2d Cir. 1999) ("After all, the ALJ is in a better

position to decide issues of credibility.").

45

Plaintiff argues that despite the fact that she "gave detailed statements regarding her psychiatric symptoms and resulting limitations, her limited activities of daily living, and her lack of any significant response to treatment," the ALJ "merely made a conclusory finding suggesting that he discounted [p]laintiff's statements . . . solely based on his characterization of [her] treatment records . . ." (Pl. Memo. at 16). First, the single paragraph of plaintiff's brief that summarizes her testimony belies the characterization of her statements as "detailed." Plaintiff testified only that she could not concentrate, that she felt uncomfortable around other people and that, with respect to activities of daily living, her daughter did "everything" for her.

Second, as explained above, the ALJ considered plaintiff's subjective complaints and the assessments of her treating psychiatrist and the consultative psychologists in determining plaintiff's mental RFC. The ALJ compared Dr. Contreras's opinions to her notes from plaintiff's treatment, which included plaintiff's statements about her mental health over a period of more than three years. The ALJ then contrasted Dr. Contreras's assessment of plaintiff's abilities with the opinions of the consultative psychologists, which, again, included plaintiff's statements with respect to her activities of daily living and her

46

mental limitations. Thus, contrary to plaintiff's argument, the ALJ's consideration of plaintiff's statements exceeded "a conclusory finding." Furthermore, as the Commissioner correctly argues (Def. Memo. at 25), the ALJ was not required to discuss all of the relevant factors. Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013); accord Conyers v. Comm'r of Soc. Sec., 17 Civ. 5126 (BCM), 2019 WL 1122952 at *16 (S.D.N.Y. Mar. 12, 2019) (Moses, M.J.); Martes v. Comm'r of Soc. Sec., 344 F. Supp. 3d 750, 767 (S.D.N.Y. 2018) (Gorenstein, M.J.); Duffy v. Comm'r of Soc. Sec., 17 Civ. 3560 (GHW)(RWL), 2018 WL 4376414 at *19 (S.D.N.Y. Aug. 24, 2018) (Lehrburger, M.J.) (Report & Recommendation), adopted at, 2018 WL 4373997 (S.D.N.Y. Sept. 13, 2018) (Woods, D.J.). Because the ALJ's reasoning was sufficiently set forth in his decision, the record demonstrates that he did not fail to properly consider plaintiff's testimony.

IV.  Conclusion

Accordingly, for all the foregoing reasons, plaintiff's motion is denied.  The Clerk of the Court is respectfully requested to mark this matter closed.

Dated:  New York, New York
        September 3, 2019

                              SO ORDERED


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

All Counsel